**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

_____

YAN LIU, *on behalf of herself and others*
*similarly situated*,

           Plaintiff,                            Case No.:

                                            **CLASS ACTION COMPLAINT**

            v.

                                            **JURY TRIAL DEMANDED**

M. BERKSON LLC, d/b/a NEWBORN ADVANTAGE
SURROGACY, MINDY B. BERKSON, and SANTA
MONICA FERTILITY CENTER, LLC

           Defendants.

_____

Plaintiff YAN LIU ("Plaintiff"), individually and on behalf of all other persons similarly situated,

by her undersigned attorneys, pursuant to this Class Action Complaint against the Defendants M.

BERKSON LLC, d/b/a NEWBORN ADVANTAGE SURROGACY, MINDY B. BERKSON,

AND SANTA MONICA FERTILITY CENTER, LLC ("Defendants"), alleges the following:

## <u>NATURE OF THE ACTION</u>

    1.     Plaintiff brings this consumer protection class action seeking redress for

Defendants' unfair and deceptive marketing of their surrogacy matching services, called Newborn

Advantage Surrogacy. Defendants market their services to prospective parents in need of surrogate

mothers by promising that Defendants will match them with suitable surrogates swiftly and

seamlessly, assuring them that Newborn Advantage can identify suitable surrogates far faster than

competitors. This is utterly false, however. Defendants also promise prospective parents that there

is a high likelihood that Newborn Advantage's surrogacy candidates will pass medical and

psychological clearance evaluations when, in truth, there is a far higher likelihood that they will fail these. As a result of these deceptive misrepresentations, Class members who have retained Newborn Advantage Surrogacy either never found a suitable surrogate or did so only after long delays, in an emotionally fraught context where time is critical. In the process, Plaintiff and Class members have expended considerable sums not only on Defendants' considerable fees but also on medical clearance evaluations and ancillary costs, without ever receiving the kind of service promised by Defendants.

## PARTIES

2.      Plaintiff YAN LIU is a resident of New York County, New York.

3.      Defendant M. BERKSON LLC, d/b/a NEWBORN ADVANTAGE SURROGACY is a domestic limited liability company that purports to match surrogate mothers with families in need of them. Its primary place of business is located at 3838 Oak Lawn Avenue, Dallas, Texas 75219. Its registered agent for service of process is Mindy B. Berkson, at 3131 McKinney Avenue, Suite 600, Dallas, Texas 75204.

4.      M. BERKSON, LLC was formerly registered in Texas as NEWBORN ADVANTAGE SURROGACY, LLC and LOTUS BLOSSOM CONSULTING, LLC.

5.      Defendant MINDY B. BERKSON is the chief executive and an owner of M. BERKSON, LLC.

6.      Defendant SANTA MONICA FERTILITY CENTER, LLC is a limited liability company formed in California with a principal place of business at 2825 Santa Monica Boulevard, Suite 100, Santa Monica, California 90404. Its agent for service of process is Kelly Andrews, 6720 N. Scottsdale Rd., Suite 160, c/o Pinnacle Fertility Scottsdale, CA 85253.

2

7.      Defendant SANTA MONICA FERTILITY CENTER, LLC acquired Defendant M. BERKSON, LLC, in whole or in part, in late 2020 (when it was registered as NEWBORN SURROGACY ADVANTAGE, LLC).

8.      SANTA MONICA FERTILITY CENTER, LLC did not simply acquire equity in M. BERKSON, LLC but merged its operations with the new acquisition. *Business Insider* reported at the time:

> "The combination of Santa Monica Fertility and Newborn Advantage Surrogacy allows both companies to expand upon their abilities to provide care for those hoping to start a family," said Mehran Ahmed, Principal at Webster Equity Partners. "We are excited to partner with Mindy and the NAS team to help more intended parents with surrogacy in the coming years."
>
> "I truly believe, from the bottom of my heart, merging with Santa Monica Fertility is the right thing to do for our agency, our team and the intended parents we serve today and will serve in the future," said Mindy Berkson, Founder of NAS. "We share a joint vision in that both of our firms were founded on the principle of helping families grow through quality of care and the highest standards in the industry, making this merger a seamless and natural fit."[1]

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative Class is a citizen of a different state than Defendants, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

10.     This court has personal jurisdiction over Defendants because (1) M. Berkson, LLC's primary place of business is in Texas; (2) Corporate Defendant M. Berkson, LLC is registered in Texas; (3) the violations for which this action seeks redress originated in Texas.

---

[1]     https://markets.businessinsider.com/news/stocks/forreragroup-advises-newborn-advantage-surrogacy-in-its-sale-to-santa-monica-fertility-1029508359

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### Background: The Surrogacy Industry

12.    Every year, thousands of American couples who hope to have a child but may face medical obstacles to doing so seek out the services of surrogate mothers, who will give birth to the couple's baby after being implanted with an embryo created with the gametes of one or both intended parents. The journal *Reproductive Biomedicine Online* explains the procedure:

> Surrogacy is the practice where one woman carries and gives birth to a baby that she intends to give to others – the intended parents – to raise, following a preconception agreement. A surrogate pregnancy can be established using IVF or intrauterine insemination performed in a fertility clinic, using an embryo the intended parents have created using their gametes (with either a fresh or frozen embryo transfer), or one or both of the intended parents' gametes may be substituted by a donor egg or spermatozoa where necessary. In either case, the surrogate will not be genetically related to the resulting child. IVF surrogacy (also known as 'gestational' or 'host' surrogacy) is the most common form of surrogacy in today's context, but some 'traditional' surrogacy is practised, whereby a surrogate is inseminated (or self-inseminates, often at home) with an intended father's spermatozoa. In this case, evidently, she is genetically related to the baby she carries.

> Surrogacy is a means of family formation for infertile heterosexual couples, often after a long and painful journey through IVF and/or experience of recurrent miscarriage, or for same-sex couples. It can also be used – among other examples – by women who have had fertility-ending cancer treatment, or who were born with a congenital condition such as Mayer–Rokitansky–Küster–Hauser syndrome, meaning they were always unable to carry a child, or who suffer from tokophobia, or are otherwise medically advised against pregnancy. It can also be used by single people.[2]

13.    Unfortunately, finding an appropriate surrogate is no easy task, as the surrogate must be not only willing but also physically and psychologically fit for the task. To this end, most

---

[2] https://www.rbmojournal.com/article/S1472-6483(23)00863-5/fulltext

couples turn to agencies that specialize in matching couples with suitable surrogates, with these agencies typically promising fast and efficient matching based on the couple's particular preferences and criteria.

14.     Many observers have noted that this has enabled considerable fraud, given would-be parents' desperation for a child and the unregulated nature of the surrogate matching industry. As *The New York Times* observed in the wake of one surrogacy scandal:

> The emerging Planet Hospital story, which Mr. Rupak characterized as one of mismanagement rather than fraud, stands as a cautionary tale about the proliferation of unregulated surrogacy agencies, their lack of accountability and their ability to prey on vulnerable clients who want a baby so badly that they do not notice all the red flags.

> In fact, hundreds of new surrogacy businesses advertise their services on the Internet because anyone can establish an agency, regardless of background or expertise. Agencies are started and disappear, sometimes reappearing under a new name.[3]

15.     In many cases, the problem goes beyond mismanagement into outright fraud. As one private investigator recounts in *Pursuit Magazine*:

> For couples who desperately want a child but are unable to conceive, surrogacy can be a beacon of hope. But in my work as a private investigator, I've seen the dark side of this hopeful venture: surrogacy scams.

> The emotional cocktail of hope and heartache can make infertile couples targets for a host of cruel scams in the surrogacy realm. My experiences working for anguished clients who've been preyed upon by fraudsters cemented my mission to safeguard parents as they navigate the surrogacy industry.

> One of the most sophisticated surrogate scams I've encountered involved a sham surrogacy agency. Potential parents were wooed with glossy brochures, heartfelt surrogate testimonials, and even staged meetings. Once substantial fees were secured, the agency's communication became sporadic. The intended parents were often pacified with excuses of legal complications or medical delays.

---

[3]     https://www.nytimes.com/2014/07/28/us/surrogacy-agency-planet-hospital-delivered-heartache.html

But the promised surrogates never existed.[4]

16.     The problem has become so pervasive that some law firms have adopted surrogacy

agency fraud as a practice area. One such firm explains:

> Once again, another surrogacy "agency" is accused of taking advantage of families struggling with infertility and defrauding them of thousands of dollars.
>
> Although surrogacy programs may refer to themselves as "agencies," this designation is misleading. Unlike an adoption agency which is highly regulated by the State Government, anyone who gets a business license can call themselves a "surrogacy agency." There are no licensing requirements, nor are there any educational or experiential requirements. If a person has a business license, a computer, and access to the internet, they can open a "surrogacy agency."[5]

17.     These problems have only been aggravated in the wake of the Covid pandemic,

which, owing to a variety of factors, has led to a shortfall of surrogacy candidates. *The New York*

*Times* reports:

> Before the pandemic, surrogate mothers were typically paid about $35,000 (fees are unregulated and usually determined by the surrogates and their agencies, if they work with one) and wait times for a match tended to be about three to six months.
>
> Now, Mr. Lee, 31, and his husband, who conceived their embryos using donor eggs, have increased their offer to $50,000 plus medical fees and other compensation, such as maternity clothing and transportation costs.
> ---------
> There is intense demand to recruit more surrogates, said Eran Amir, 44, the founder of GoStork, a fertility marketplace where intended parents may find, compare and connect with fertility providers, including surrogacy agencies.
> --------
> Benevolent motives and relationships aside, the surrogacy process has become a bidding war, Mr. Amir said, especially within the larger agencies. With the current shortage, the agencies have started trying to lure more surrogates in any way they can.
> ---------

---

[4]   https://pursuitmag.com/the-silent-epidemic-of-surrogate-scams-a-private-investigators-inside-look/
[5]   https://tdlawgroup.com/beware-of-surrogacy-agency-fraud/

Shirley Zager, a consultant and the owner of Parenting Partners in Gurnee, Ill., the agency Mr. Lee and his husband are using, said that before the pandemic her surrogates had typically requested $30,000 to $35,000 in compensation. Today, it can be as much as $75,000.

"They are aware that they can ask for more," Ms. Zager said. Some have even made other requests, such as post-birth tummy tucks, spa days, a recovery trip and more, though Ms. Zager declines to accept those women into her agency.[6]

## **Defendants' Fraudulent Misrepresentations**

18.    Defendants present themselves as guaranteeing a level of service that other surrogacy agencies cannot provide. The homepage of Newborn Advantage Surrogacy's website makes the following representations to potential clients looking for a surrogate:



19.    Newborn Advantage's assurance that it can effectuate matches many, many times faster than other surrogacy agencies is repeated on its facebook page:

---

[6] https://www.nytimes.com/2022/04/02/style/surrogate-shortage-us-pandemic.html



20.     Elsewhere on its website, Newborn Advantage indicates to potential clients that a two-week wait for a suitable match is on the *upper end* of normal turnaround times and that a suitable match can often be found in less time than that:

| About Us | Our Surrogates | Matching | Getting Started |
|---|---|---|---|

**Swift and Seamless Surrogate Matches**

At Newborn Advantage, we understand the importance of finding the right surrogate for your family. That's why we offer a swift and seamless matching process. In the event that a surrogate does not pass psychological or medical screening by your fertility doctor, we will rematch you at no additional fee. Our industry-leading average match time of 0-2 weeks ensures that you can embark on your surrogacy journey without unnecessary delays.

21.     Beyond this, Newborn Advantage stresses to potential clients that they will not have to compromise on the surrogate's suitability because Newborn Advantage can find surrogates who are not only medically adequate but also match the client's ideal criteria. The "Our Services" page of the Newborn Advantage website makes the following representations:

8

## Match Quickly With High-Quality Surrogate Candidates

We help you to identify candidates suitable to your ideal criteria. Match times are typically less than two weeks, due to our extensive network of high-quality candidates and excellent recruiting staff.

## Access Candidates Not Available on Public Databases

Through our proprietary networks, we offer unlimited access to qualified and available candidates who meet your specific criteria.

## Our Match Guarantee

In the unlikely event that a surrogate does not pass extensive psychological or medical screenings, we will rematch at no additional fee within a shortened match period.

### Share Unlimited Number of Profiles

Selecting a surrogate profile can be overwhelming and emotional, especially if there are not enough profiles to draw among. Sometimes desired criteria changes with the opportunity to view from several profiles and a variety of recruiting styles. Given the vast access to surrogate profiles, we can match clients closely to desired criteria and typically in less than two weeks.

22.     Thus, Newborn Advantage promises to find candidates corresponding to clients' "ideal criteria" and "specific criteria" and "desired criteria." It also assures clients that they can change their "desired criteria" over the course of the matching process. Newborn Advantage also informs clients that the risk of a proposed surrogate failing "extensive psychological and medical screenings" is low and that "[i]n the unlikely event" this happens, Newborn Advantage will find another match "within a shortened match period."

23.     Unfortunately, Plaintiff's experience with Defendants revealed that these representations are highly deceptive, as is often the case with surrogacy clinics.

9

24.    Plaintiff's relationship with Newborn Advantage began auspiciously. In reliance on Defendants' website representations, Plaintiff contacted Defendant Berkson to discuss retaining her surrogate matching services. Defendant Berkson quickly proposed a surrogate, Amber from Texas, even before Plaintiff signed any contract. Plaintiff and her spouse had read Amber's profile, interviewed her with Zoom, and concluded that she appeared like an adequate surrogate. Plaintiff was therefore led to believe that Defendants could readily deliver on their promises. And so, Plaintiff agreed to pay Defendant Berkson's $36,000 fee, and Amber's name was written into the contract itself, executed in February 2022, with the proviso that Newborn Advantage would seek out an additional surrogate if Amber failed medical and psychological clearance evaluations.

25.    Amber did fail these evaluations, as did all but one of the approximately five (5) surrogates that Plaintiff and her spouse subsequently identified as suitable. Newborn Advantage's website represents to prospective clients, including Plaintiff, that a prospective surrogate failing medical clearance evaluations is an "unlikely event." In reality, it was *passing* the clearance evaluations that turned out to be the unlikely exception. Failure was the norm.

26.    Defendants also misrepresent the amount of time required to find a "match." Newborn Advantage stresses that it can find "the perfect candidate" in two weeks or less and contrasts this speediness with normal average wait times at other surrogacy agencies, "who can take up to 8 months to match you with the right candidate." This is patently false. Defendant Berkson did sometimes *propose* a potential candidate within two weeks of the previous candidate falling through, and Plaintiff and her spouse might, also within that two-week period, identify a candidate as potentially suitable based solely on her written response to a questionnaire. However, it would typically take quite a bit longer to arrange for an interview with the candidate. More significantly, it would then take *months and months* before the medical clearance evaluations could

10

take place (which typically ended in failure, as discussed above). Defendants failed to disclose to Plaintiff and Class members that the demand for the services of surrogacy clinics is such that one must wait for months on a waiting list *just to begin the process*, during which the clinic must medically evaluate not only the proposed surrogate but also the would-be parents, only adding to the delay.

27.    There were also many occasions when Defendant Berkson could not even *propose* a potentially suitable new candidate after the previous candidate had fallen through, despite Newborn Advantage's purported "vast access to surrogate profiles," causing even more delay and frustration beyond that created by the medical clearance process.

28.    This is why only a handful of proposed surrogates were medically evaluated in *the nearly two years* between the start of Plaintiff's relationship with Defendants, in February 2022, and the Fall of 2023, when Plaintiff concluded that Defendants would not deliver on their representations and demanded a refund of the $36,000 fee, which Defendants refused to provide.

29.    Defendants claim that they can deliver a suitable surrogate in about 1/16th the time required by other surrogacy agencies (two weeks versus eight months). However, it can take other agencies eight months because those eight months *include* all the months required to first wait for, and then undergo, the medical clearance evaluations. It can take Newborn Advantage a mere two weeks to find a match because finding a match, as implicitly defined by Newborn Advantage, does *not* include the many months required for medical clearance evaluations.

30.    Defendants thus used a deceptive apples-and-oranges comparison to mislead Plaintiff and Class members into believing that Newborn Advantage offers a speedier and more efficient service than its competitors. And given that most of the surrogate candidates proposed by Newborn Advantage *fail* their medical clearance evaluations, it will typically take much longer

that the competitors' eight months for a Newborn Advantage client to have *any hope at all* of finding a suitable surrogate.

31.     Defendants say that "our process will place you with the perfect candidate within two weeks." But a candidate can hardly be "perfect" if she cannot pass medical and psychological clearance evaluations, making Defendants' representations completely deceptive.

32.     Defendants also misled Plaintiff and Class members by representing to them that Newborn Advantage can find suitable surrogates based on the would-be parents' "ideal criteria" or "specific criteria" or "desired criteria."

33.     By October 5, 2023, Plaintiff despaired that Newborn Advantage would ever find a suitable match. Newborn Advantage's latest proposed surrogate, Marilena, had failed medical clearance in August, and Defendant Berkson still did not have any proposed alternatives. At this point, Plaintiff and her spouse lost all patience and asked Defendant Berkson for "a refund for services not rendered" if more candidates were not immediately forthcoming. Defendant Berkson had no such candidates available, however, and, refusing to give a refund, told Plaintiff, "Your requirements are too stringent making matching very difficult.  When I have an option I will send the profile."

34.     The "stringent" requirement in question was that the surrogate not consume coffee during the pregnancy. There was nothing unreasonable about this expectation, however. Defendants represented to Plaintiff and Class members that they would find a surrogate based on their "ideal" criteria, and there was nothing unreasonable about Plaintiff's criteria.

35.      It is well-accepted that caffeine consumed during pregnancy can negatively impact fetal development. A study sponsored by the National Institutes of Health (NIH) observed that "[p]regnant women who consumed the caffeine equivalent of as little as half a cup of coffee a day

on average had slightly smaller babies than pregnant women who did not consume caffeinated beverages." The NIH explains:

> Compared to infants born to women with no or minimal blood levels of caffeine, infants born to women who had the highest blood levels of caffeine at enrollment were an average of 84 grams lighter at birth (about 3 ounces), were .44 centimeters shorter (about .17 inches), and had head circumferences .28 centimeters smaller (about .11 inches).
>
> Based on the women's own estimates of the beverages they drank, women who consumed about 50 milligrams of caffeine a day (equivalent to a half cup of coffee) had infants 66 grams (about 2.3 ounces) lighter than infants born to non-caffeine consumers. Similarly, infants born to the caffeine consumers also had thigh circumferences .32 centimeters smaller (about .13 inches).
>
> The researchers noted that caffeine is believed to cause blood vessels in the uterus and placenta to constrict, which could reduce the blood supply to the fetus and inhibit growth. Similarly, researchers believe caffeine could potentially disrupt fetal stress hormones, putting infants at risk for rapid weight gain after birth and for later life obesity, heart disease and diabetes.
>
> The authors concluded that their findings suggest that even moderate caffeine consumption may be associated with decreased growth of the fetus.[7]

36.    The study's researchers also believe that "caffeine could potentially disrupt fetal stress hormones, putting infants at risk for rapid weight gain after birth and for later life obesity, heart disease and diabetes."

37.    In the same vein, an analysis of observational studies published in *BMJ Evidence Based Medicine* recommended that "[w]omen who are pregnant or trying to conceive should be advised to avoid caffeine because the evidence suggests that maternal caffeine consumption is associated with negative pregnancy outcomes and that there is no safe level of consumption." The study determined "that there is 'substantial cumulative evidence' of an association between maternal caffeine consumption and diverse negative pregnancy outcomes, specifically

---

[7]        https://www.nih.gov/news-events/news-releases/moderate-daily-caffeine-intake-during-pregnancy-may-lead-smaller-birth-size

miscarriage, stillbirth, low birth weight and/or small for gestational age, childhood acute leukaemia and childhood overweight and obesity."[8]

38.     In light of the medical consensus, there was nothing particularly "stringent" in Plaintiff's insistence that Newborn Advantage find a surrogate who would agree not to consume coffee during the pregnancy. The questionnaires that Newborn Advantage gave potential surrogates asks them to "describe your daily diet in detail," including "what types of food do you eat on a regular basis." So, it was perfectly reasonable for Plaintiff to take caffeine consumption into consideration in formulating her "ideal criteria" for the "perfect candidate." It is natural that future parents will do everything possible to reduce their future child's risk of obesity, diabetes, heart disease, and leukemia—especially when they will be paying well into the six-figures for the entire surrogacy process, including the surrogate's and surrogacy clinic's fees.

39.     Perhaps not all defrauded Class members were concerned with the surrogate's caffeine consumption. But Plaintiff's particular experience illustrates Defendants' general pattern of deception and exploitation. Defendants promise clients that a suitable candidate can be found in a mere two weeks while knowing that the actual time will certainly be no shorter than the eight months taken by the competitors with which Defendants speciously contrast themselves. Defendants further promise that surrogacy candidates will most likely pass medical clearance evaluations even though these candidates fail more often than not, requiring intended parents to restart the whole process from the beginning. Once the client becomes exasperated with the ongoing complications and delays, Defendants blame the client for having overly "stringent" requirements, even though the requirements mirror the recommendations of mainstream medical

---

[8]         https://www.bmj.com/company/newsroom/no-safe-level-of-caffeine-consumption-for-pregnant-women-and-would-be-mothers/

authorities—and after having assured clients that they will not be asked to compromise on their specific criteria for a surrogate.

40.     Plaintiff is far from alone in falling victim to Defendants' fraudulent scheme.  Here are some of Newborn Advantage's online reviews:

> I had a bad experience and lost thousands. Now she's sold this company to Santa Monica Fertility. Don't just read the "glowing" reviews of people who make money with this company and Mindy Berkson. Scroll down and read the scathing reviews from heartbroken people wanting desperately to be parents who were ripped off by this charlatan.[9]

> ---------

> Mindy,

> How would you defend stealing our money as well? You took a non refundable deposit and delivered us nothing but lies. I urge anyone to go elsewhere. I can't wait for the fertility business to be regulated. It would weed out these businesses.[10]

> --------

> My experience with Lotus Blossom and Mindy Berkson was awful. I found her to be evasive and deceptive, and I could never recommend her or her consulting business. I warn you to select any other service or agency other than hers. Let me summarize my experience with her. She wasted my time for months without locating a suitable and medically cleared surrogate. One of her biggest selling points is that she will locate a suitable candidate for you in two to four weeks. Over four months later, no candidate. The several she presented to us were denied medical clearance. When asked if she felt these women were good candidates, she would NOT directly answer my question and gave me round about answers. This has been a horrific experience with her.

> Her fee structure is the Most expensive of any I researched, and I was willing to pay more if it meant a quick turnaround time. Was I mistaken about that.

> Do not ever consider using her services because if your experience is half as bad as

---

[9] https://www.yelp.com/biz/newborn-advantage-surrogacy-dallas

[10] https://www.yelp.com/biz/newborn-advantage-surrogacy-dallas

mine, you are going to be severely disappointed, get no results, and be out significant money.

I implore you to stay away from Lotus Blossom Consulting and Mindy Berkson. I wish someone had warned me.[11]

---------

I have nothing positive to say about this company. First, she both advertises and entices you by saying she can find a surrogate in 2 to 4 weeks. Almost 6 months later and no surrogate. We have already talked to several potential surrogates and some dropped out after the meeting or the company could not find them and the others did not pass medical clearance. We have been disappointed over and over again. When we asked if this is common Mindy evades the question. We are thinking about terminating our contract, but we have heard that she won't refund your money. So now my husband and I feel like we are stuck. Hope she finds someone.[12]

-------------

For starters, it should be a warning to any intended parent reading this, that the only 5 star reviews are from surrogates themselves, and the rest of the reviews (which are all bad), come from intended parents like me, who have had bad experiences with Lotus Blossom.

Mindy Berkson's company takes surrogates from other agencies, so she has a constant flow of women wanting to be pregnant. They act more like a broker. Offering a quick-match is a godsend to many intended parents. Unfortunately finding a woman who wants to be a surrogate doesn't necessarily mean she's always a qualified candidate. And it's clear at least from my experience, the surrogate I was going to use from Mindy's agency wasn't properly vetted. She couldn't find crucial medical history records, didn't have updated tests, and red flags popped up by my doctor's office. I began to feel that I was using an agency that didn't do the diligent screening I was paying for. So I immediately felt uncomfortable and I got out.

I am so happy I got out when I did, even if it cost me almost $10,000 to leave Lotus Blossom (she kept a chunk of my money but I did get much of it back). Since then, I found another agency through my doctor.* They had the candidate do screenings, made sure she had all of her medical records, she's been a successful surrogate twice before, she's in the same state (Connecticut) as my doctor, and they helped me get into Obamacare before open enrollment closed. Finding this new firm when I did,

---

[11] https://www.yelp.com/biz/newborn-advantage-surrogacy-dallas?start=10

[12] https://reviews.birdeye.com/lotus-blossom-consulting-llc-819248896

and getting quickly back on track has been such a relief. Talk about a godsend for me as an intended parent :)..

Please don't just read Yelp reviews when making a decision as important as this. But honestly I wish I had read other reivews here because I probably would never have hired Mindy. Do your own research. Search extensively. Better Business Bureau, RipoffReport, and other sites.

There are many good surrogacy companies. To me, the other reviews here feel that they're not one of them. Caveat emptor.

* The agency I'm now using is called Northeast Surrogacy Partnerships. They are a husband and wife team and they cost about half the price of Lotus Blossom. They even gave me $5,000 off their fee, because they knew of my bad experience and costs I had to incur with Mindy. Also, unlike Mindy who required prepayment in full before I even got to talk on the phone with a potential surrogate, this agency billed me only after I met in person with and was 100% happy with my surrogate choice. Honestly for me price wasn't the main issue. Having a healthy baby was and remains the only issue that matters. I would have happily paid Mindy even more if she just did her job. But for me at least, she clearly didn't.[13]

41.    These reviews mirror Plaintiff's experience as recounted above. These intended parents, too, came to realize that Defendants' grand promises of expeditious, individually-tailored service were hollow, as weeks turned into months as one candidate after another failed medical clearance evaluations or proved otherwise unsuitable.

42.    Plaintiff and Class members reasonably relied on Defendants' false and/or misleading representations. They did not know, and had no reason to know, that the Defendants would not deliver on these representations.

43.    (1) The time required to find a suitable surrogate, (2) the chances that a potential surrogate will pass medical clearance, and (3) the right to ask that surrogates be selected according

---

[13]                                 https://www.yelp.com/biz/newborn-advantage-surrogacy-dallas?adjust_creative=yahoo&hrid=7g0S9hYlw87RfRvLKt_o9A&utm_campaign=yelp_feed&utm_medium=feed_v2&utm_source=yahoo

to one's own criteria are all considerations that are material to a reasonable consumer's decision to retain a surrogate matching agency.

44.     Plaintiff and Class members would not have retained Newborn Advantage had they known the truth.

45.     Defendants know that their representations were, and continue to be, deceptive and misleading. Being highly familiar with the industry in which they participate, Defendants know how long it was likely to take to find suitable surrogates and that they would be unable to find suitable surrogates for many clients.

46.     Defendant Berkson knew that clients would not quickly sever their relationship with her even when signs of her deceptive practices began to emerge. The clients had already her a hefty retainer ($36,000 in Plaintiff's case) that Defendant Berkson would not refund. As significantly, the search for a suitable surrogate is an emotionally fraught process, and would-be parents' yearning for a child permitted Defendant Berkson to feed the parents' hope that the right match was just around the corner and that previous failures were just bad luck.

47.     Defendants represent to the public: "Compared to other agencies who can take up to 8 months to match you with the right surrogate, our process will place you with the perfect candidate within two weeks." But Defendants know that this comparison is specious, given that "right surrogate" has been implicitly defined differently for Newborn Advantage and its competitors. For Newborn Advantage, "right surrogate" means a surrogate who appears suitable on paper or perhaps after an interview. For competitors, "right surrogate" means a surrogate who has actually passed medical and psychological clearance evaluations—which surrogates often fail and, in any case, require months to initiate. Defendants willfully employed this doublespeak to

induce desperate would-be parents to retain Newborn Advantage and pay it substantial sums for a service they would not receive.

48.     Even if reasonable consumers expected that the medical clearance evaluations would take some additional time beyond the two weeks needed to first identify a potentially suitable match, they did not expect that this additional time would be so long as to dwarf the initial two weeks. This was especially problematic given that, contra Defendants' representations, there was a high likelihood that the candidate would fail the evaluations and the whole matching process would have to restart from scratch.

49.     In some cases, the surrogacy clinics rejected the candidate proposed to Plaintiff based on the candidate's medical history alone, without the need for actual testing. The rejection was therefore foreseeable to those in the surrogacy business. Nevertheless, Defendants' wasted months of Plaintiff's time with such candidates.

50.     Plaintiff and Class members were injured by Defendants misrepresentations because they received less value from Defendants than what they bargained for in reliance on those representations. In exchange for their payments to Defendants, Plaintiff and Class members were promised a suitable surrogate within two weeks, but they either (1) never received a suitable surrogate or (2) received one only after many months or years.

51.     Plaintiff and Class members were also injured because Defendants' deceptive practices caused them to expend significant sums on services related to the surrogacy process, such as paying surrogacy clinics to conduct medical and psychological clearance examinations, travel expenses associated therewith, as well as legal services.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who, within the applicable limitations period, (1) were paying clients of Defendants; (2) had not been matched with a suitable surrogate[14] within 2 weeks of retaining Defendants; and (3) were not refunded in full the Case Management Fee they paid to Defendants ("the Class").

53.     Some Class members never obtained suitable surrogates while others obtained one only after a long delay that violated Defendants representations of swift service. So, different Class members may be entitled to different damages. But this difference has no bearing on Defendants' liability to all Class members, as all Class members received less than what they bargained for on the basis of Defendants' deceptive misrepresentations.

54.     Plaintiff brings her own claims and the Class claims under (a) the Texas Deceptive Trade Practices Act (TDTPA) and (b) common law fraud.

55.     Should the TDTPA be inapplicable to the claims of Plaintiff and other out-of-state Class members, Plaintiff alternatively brings her claims under NY GBL § 349 (New York Deceptive Trade Practices Act) and NY GBL § 350 (New York False Advertising Law) and brings the claims of Class members under the consumer protection laws of each state (including the District of Columbia) in which any Class member resides. These statutes include:

These statutes include:

a.  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. § 8-19-1, *et seq.*;
    Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;
b.  Arizona Consumer Fraud Act, Arizona Revised Statutes, § 44-1521, *et seq.*;
c.  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

---

[14] "Suitable surrogate" means a surrogate that was chosen by the Class member *and* passed all required medical and psychological clearance evaluations.

d. California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

e. Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

f. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

g. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

h. District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*;

i. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

j. Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;

k. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480-1*, et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;

l. Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

m. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

n. Indiana Deceptive Consumer Sales Act, Indiana Code Ann. § 24-5-0.5-0.1, *et seq.*;

o. Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*;

p. Kansas Consumer Protection Act, Kan. Stat. Ann § 50 626, *et seq.*;

q. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et seq.*;

r. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;

s. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

t. Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;

u. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

v. Michigan Consumer Protection Act, § 445.901, *et seq.*;

w. Minnesota Prevention of Consumer Fraud Act, Minn. Stat § 325F.68, *et seq.*, and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

x. Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

y. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

z. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq.*;

aa. Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

bb. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;

cc. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*;

dd. New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*;

ee. New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*;

*ff.* New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York False Advertising Law, N.Y. Gen. Bus. Law § 350, *et seq.*;

*gg.* North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15-01, *et seq.*;

*hh.* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes § 75-1, *et seq.*;

*ii.* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. § 4165.01, *et seq.*;

*jj.* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

*kk.* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;

*ll.* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § 201-1, *et seq.*;

*mm.* Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

*nn.* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

*oo.* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24-1, *et seq.*;

*pp.* Tennessee Trade Practices Act, Tennessee Code Annotated § 47-25-101, *et seq.*;

*qq.* Texas Stat. Ann. § 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.*;

*rr.* Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, *et seq.*;

*ss.* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

*tt.* Virginia Consumer Protection Act, Virginia Code Ann. § 59.1-196, *et seq.*;

*uu.* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.*;

*vv.* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

*ww.* Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*;

*xx.* Wyoming Consumer Protection Act, Wyoming Stat. Ann. § 40-12-101, *et seq.*

56.     The proposed Class excludes current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, any entity in which they have or had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

57.     Plaintiff reserves the right to revise Class definitions based on facts learned in the course of litigating this matter.

58.     This action is proper for Class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class

members are unknown to Plaintiff at this time, Plaintiff is informed and believes that there are hundreds if not thousands of Class members. Thus, the Class members are so numerous that individual joinder of all Class members is impracticable.

59.     Common questions of law and fact arise from Defendants' conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include:

a.     Whether Defendants misrepresented to Class members the amount of time it would take to find a suitable surrogate;

b.     Whether Defendants misrepresented to Class members the likelihood that potential surrogates would pass medical and psychological clearance evaluations;

c.     Whether Defendants misrepresented to Class members that suitable matches could be found on the basis of Class members' own individualized criteria;

d.     Whether Defendants deprived Class members the benefit of their bargains by delivering services that were inferior to those represented;

e.     Whether Defendants issued their deceptive and misleading representations willfully;

60.     Plaintiff's claims are typical of those of Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed above. Plaintiff and Class members retained Defendants' services and sustained similar injuries. Defendants' unlawful, unfair, and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Class were caused directly by Defendants' unfair and deceptive practices. In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a

common thread of misconduct resulting in injury to all Class members. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

61.    Plaintiff will fairly and adequately represent and pursue the interests of the Class and has retained competent counsel experienced in prosecuting class actions. Plaintiff understands the nature of her claims herein, has no disqualifying conditions, and will vigorously represent the interests of Class members. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.

62.    Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for them.

63.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

64.    The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

65.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

66.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

67.     Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff seek, *inter alia*, equitable remedies with respect to the Class as a whole. Defendants' systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES ACT**
**(Tex. Bus. & Com. Code § 17.50 et seq.)**

**(Brought by Plaintiff on behalf of herself and the Class)**

68.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein and further alleges as follows:

69.     Defendants liable for violating the Texas Deceptive Trade Practices Act ("DTPA").

70.     The DTPA prohibits both deceptive misrepresentation and other unconscionable conduct that may not involve specific misrepresentations:

The DTPA permits a consumer to maintain an action where any deceptive trade practice enumerated in section 17.46 is a producing cause of the consumer's actual damages. Section 17.50(a)(1). One prohibited practice is to represent that goods or services have characteristics, uses, or benefits that they do

> not have. Section 17.46(b)(5). The DTPA further provides that a consumer may maintain an action where any person's unconscionable action or course of action is a producing cause of the consumer's actual damages. Section 17.50(a)(3). An unconscionable action is one that, to the consumer's detriment, results in a gross disparity between the value the consumer received and the consideration paid in a transaction involving the transfer of consideration. *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985); section 17.45(5)(B). A consumer may maintain a DTPA cause of action for unconscionable conduct even if the seller made no specific misrepresentations. *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 538 (Tex. App. 1989, writ denied). Neither action requires a consumer to prove that the seller intended to deceive the consumer. *Chastain,* 700 S.W.2d at 583; Smith v. Baldwin, 611 S.W.2d 611, 616 (Tex. 1980).

*Teague v. Bandy*, 793 S.W.2d 50, 54 (Ct. of Appeals of Tex, Third District, Austin, June 13, 1990)

71.     The DTPA permits actions for failure to disclose if "(1) the defendant knew information regarding the goods or services, (2) the information was not disclosed, (3) there was an intent to induce the consumer to enter into the transaction through the failure to disclose, and (4) the consumer would not have entered into the transaction had the information been disclosed." *Jasek v. Tex. Farm Bureau Underwriters*, 2022 Tex. App. LEXIS 898, *7-8 (Ct. of Appeals of Tex, Fourteenth District, Houston, Feb. 8 2022) (citing Tex. Bus. & Com. Code Ann. § 17.46(b)(24)).

72.     "[I]n contrast to a fraud cause of action, the DTPA does not require proof of justifiable reliance." *Id*. at *8. "Although a plaintiff is not required to prove reliance to recover under the DTPA, reliance may be a factor in determining whether the defendant's conduct was a producing cause of the plaintiff's injuries. … As with proximate cause, there can be more than one producing cause of an injury. … Thus, the plaintiff need only show the defendant's actions were *a* producing cause of her injuries, not that they were *the* cause." *Mitchell v. Brandon Mill Assocs. Ltd.*, 1998 Tex. App. LEXIS 5519, *19-20 (Ct. of Appeals of Tex., Fifth District, Dallas, Aug. 31, 1998).

73.    Under TDTPA, a plaintiff can recover not only for economic injuries but also for mental anguish. Tex. Bus. & Com. Code § 17.50. Defendants caused Plaintiff and Class members significant mental anguish given the emotionally fraught nature of searching for a surrogate. Over and over again, Defendants raised, and then dashed, their clients' hopes for a future child.

74.    The TDTPA provides for punitive damages, called "exemplary damages," which may be awarded if the plaintiff "proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a).

75.    Under TDTPA, a consumer "who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." Tex. Bus. & Com. Code § 17.50(d).

76.    The TDTPA applies to the claims of Plaintiff and non-Texan Class members because the TDTPA "does not provide that its application will be limited to acts or practices occurring in Texas." *Browne v. World Christian Church*, A-99-CA-784 AA, 2001 U.S. Dist. LEXIS 6143, at *5 (W.D. Tex. Mar. 6, 2001). "[T]he DTPA's definition of 'trade' and 'commerce' includes the sale of any good or service 'wherever situated' if the trade or commerce directly or indirectly affects the people of Texas." *Id*. While Plaintiff is not a resident of Texas, many Class members are. Newborn Advantage's deceptive trade practices affect the people of Texas because (1) Newborn Advantage is headquartered in Texas, (2) the deceptive representations at issue in this case originated in Texas, and (3) the State of Texas has a strong interest in preventing such practices within is boundaries, even if some of those affected reside elsewhere.

77.    Defendants' conduct as described above constitutes the act, use or employment of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices and/or the

concealment, suppression, or omission of any material facts in connection with the sale of Defendants' services at Newborn Advantage.

78.    Defendants' misrepresentations and omissions as set forth herein are material to, and would be relied upon by, any reasonable consumer of surrogate matching services.

79.    Plaintiff and Class members suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the services paid for was less than the value of the services as represented. Had Plaintiff and Class members known the truth about Newborn Advantage, they would not have retained its services, or would not have retained them at the given price, since Plaintiff and Class members were willing to pay Defendants' hefty $36,000 fee only for the "swift and seamless" service that Defendants represented they were offering.

80.    The marketing of Newborn Advantage is, therefore, an unconscionable action that "results in a gross disparity between the value the consumer received and the consideration paid in a transaction involving the transfer of consideration." *Teague*, 793 S.W.2d at 54.

81.    Plaintiff and Class members are entitled to all appropriate relief, including compensatory damages for economic injuries and mental anguish, punitive damages, and attorneys' fees.

82.    Plaintiff has complied with Tex. Bus. & Com. Code § 17.505 by providing notice of her claims to all Defendants at least 60 days prior to the filing of this action.

## COUNT II

### VIOLATIONS NEW YORK DECPETIVE TRADE PRATICES ACT
### (N.Y. GBL § 349)

**(brought alternatively by Plaintiff on behalf of herself and New York Class members, alongside the consumer protection laws of each state in which a Class member resides)**

83.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

84.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

85.    Under the NY GBL § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiffs is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

86.    Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The Court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds Defendants willfully or knowingly violated this section. The Court may award reasonable attorney's fees to a prevailing plaintiff. NY GBL § 349(h)

87.    The practices employed by Defendants, whereby they advertise, promote, and market Newborn Advantage is unfair, deceptive, misleading, and in violation of NY GBL § 349.

88.    The foregoing deceptive acts and practices were directed at consumers.

89.     Plaintiff, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendants' conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT III

### VIOLATIONS OF NEW YORK FALSE ADVERTISING LAW
### (N.Y. GBL § 350)

**(brought alternatively by Plaintiff on behalf of herself and New York Class members, alongside the consumer protection laws of each state in which a Class member resides)**

90.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

91.     Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

92.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

93.     Defendants caused to be made or disseminated throughout New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known to Defendants, to be untrue and misleading to consumers and the Class.

94.     Defendants' deceptive representations and failures to disclose as alleged herein were material and substantially uniform in content, presentation, and impact upon consumers at large.

95.     Defendant has violated N.Y. Gen. Bus. Law § 350 because its false and deceptive health claims were material and likely to deceive a reasonable consumer.

96.     Plaintiff and Class have suffered an injury, including the loss of money, as a result of Defendant's false and misleading advertising.

97.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff and Class members seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT IV**

**COMMON LAW FRAUD**

*(brought by Plaintiff on behalf of herself and the Class)*

98.     Plaintiff realleges and incorporate herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

99.     Defendants intentionally made materially false and misleading representations regarding the nature of Newborn Advantage services.

100.    Plaintiff and Class members reasonably relied on Defendants' false and misleading representations. They did not know, and had no reason to know, that Defendants representations were false.

101.    Defendants knew and intended that Plaintiff and the Class members would rely on their misrepresentations.

102.    Plaintiff and Class members have been injured as a result of Defendants' fraudulent conduct.

103.    Defendants are liable to Plaintiff and Class members for damages sustained as a result of Defendants' fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendants, as follows:

a.    An Order that this action be maintained as a class action, appointing Plaintiff as representative of the Class;

b.    An Order appointing the undersigned attorney as Class Counsel in this action;

c.    Restitution and disgorgement of all amounts obtained by Defendants as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.    All recoverable compensatory damages, including damages for mental anguish;

e.    Punitive damages;

f.    An order requiring Defendants to immediately cease their wrongful conduct as set forth in this Complaint;

g.    Statutory pre-judgment and post-judgment interest on any amounts;

h.    Payment of reasonable attorneys' fees and costs; and

i.    Such other relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and all others similarly situated, demand a trial by jury on all questions of fact raised by the Complaint.


Dated: August 6, 2024

Respectfully submitted,


**LEE LITIGATION GROUP, PLLC**


By: _____*/s/ C.K. Lee*_____
            C.K. Lee, Esq.

148 West 24th Street, Eighth Floor
New York, NY 10011
Telephone: (212) 465-1188
Facsimile: (212) 465-1181
cklee@leelitigation.com

Rony Guldmann, Esq.
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-661-0052
Fax: 212-465-1181
rony@leelitigation.com
to be admitted *pro hac vice*

*Attorneys for Plaintiff and the Class*